Good morning, Your Honors. My name is Rachel Connor. May it please the Court, I represent... So if I say this is an exceedingly creepy and disturbing case, are you going to say I'm biased and prejudiced? No, Your Honor, I'm not. Facts sometimes speak for themselves, don't they? I believe that the facts, that there are two sets of facts here. One are the facts that were presented in the text messages that were interpreted by the cooperating co-defendant. I'm going to sort of back up. I don't believe that you are biased. I do believe that there's an interpretation of the facts. And in the last couple of days, the White House has been using the word colorful language to describe... Well, actually what I was referring to was your theme that the district judge should have recused herself for her comments. That's all I was talking about. I believe... I will get to that. That wasn't one of the points that I was going to... Okay, that's fine. We'll let you brief. Were you trial counsel? I was co-counsel at trial. Okay, great. Thank you. I was associate. I was not lead counsel at trial, but I was there at trial. And due to the time constraints, I'm going to address most of my comments to the Brady-Napoo violations, because I think that those are more salient for the court. And those arguments underlie the denial of the motion for new trial, which was denied without an evidentiary hearing and without the trial court recusing herself, which I think was appropriate under the circumstances both for her comments and for her relationship to the case as a fact witness and her relationship to trial counsel. I'm happy to discuss any of the... Go ahead in the order you plan to get into. I think that this case really strikes at the heart of the fundamental fairness and due process owed to a criminal defendant who is on trial for his liberty. Mark Thompson was charged, as you know, with attempting to produce a prohibited pornographic image of a child and with attempting to solicit that child through her mother. At trial, the mother, who was a cooperating co-defendant, was the prosecution's star witness. There was no ambiguity at trial that Mark Thompson's defense was that he was a fantasist who compulsively engaged in accelerating sexual fantasies with Rosalie Dornellis. And if we had been able to put on our mental health expert, I think those would have been put into the context of that there are people who engage in that sort of behavior, who are not pedophiles, but who engage in that sort of behavior as a symptom of mental illness and to avoid trauma. Are you talking about the e-mails or the actual sexual activity he had with the victim's mother? What are you focused on right now? I'm focused on the text messages. I think that the discussions between the two of them, there were things that were acted out. There were a lot of fantasies that were discussed. There were a lot of things that were brought up by Rosalie Dornellis herself as fantasies which were not actually, in fact, acted upon. And I believe that the discussions about the daughter, had the jury had this context, would have undermined confidence in the court. Let me just try to make this a little more concrete in terms of the time you have. I personally, speaking for myself, am not at all persuaded that Mr. Thompson's expert witness should have been allowed to testify since the American Psychiatric Association, or whatever it is, removed sexual, what in an older day we would have called perversions, from characterization as mental illness. And I don't see how under Daubert the district court abused her discretion in accepting that peer-reviewed conclusion. On the other hand, I am somewhat concerned about the elimination of Ms. Hasha's testimony. That's speaking for myself. So Dr. Hasha was a defense expert who was retained by Rosalie Dornellis's attorney. Right. To whom she voiced the belief that Thompson was engaging in fantasy about her daughter, right? Correct. And that happened six months after they had both been picked up, right? Right. So there was an initial statement before Rosalie Dornellis and Mark Thompson were arrested. There was an initial statement to the investigating officer of the Derrida police where Rosalie Dornellis said, this was all fantasy. He would not have had sex with my daughter. And that statement was disclosed to the defense. Six months later, with her attorney and with the psychologist, Dr. Hasha, apparently she made a very similar statement to say that this was all fantasy, that he would not have acted upon. That statement was not disclosed to the defense until well after conviction, until well after we were in the midst of direct appeal. During, when that statement was disclosed, I moved for a stay of the briefing schedule and remand to the trial court for a motion for new trial. At that point, the government responded in their response to the motion for new trial, well, we told you that Rosalie had maintained that this was all fantasy for quite some time. And, in fact, she maintained that position after she began cooperating, after she had pled guilty and agreed to cooperate with the government, and was interviewed apparently several times by the government about the charges and made similar statements, all of which to date still have not been turned over to the defense. So it appears that not only did the cooperating co-defendant make this statement, but she made it six months later to a psychologist in the presence of her defense lawyer in direct contradiction of her trial testimony that she lied to the police the one time in a completely different context after she'd been advised by counsel, after she and Mark Thompson had both been arrested, were being jailed separately, had independent counsel. Putting aside for the moment whether you're correct on the legal issue, whether it should have been turned over, et cetera, et cetera. But, in fact, she never denied in her testimony, and she was vigorously cross-examined, I assume, on having made the statements about the fantasy, et cetera, et cetera, et cetera. So, again, I'm not saying the argument on disclosure is thrown away, but I'm saying for the moment presumably you went up, down, crossways in vigorous cross-examination about the statement she made, et cetera, she didn't deny it, et cetera. So, I mean, the jury and everybody is fully aware she made these statements about fantasy and on and on and on. Is that correct or not? So it's partially correct. So she made one statement in December of 2013, I think it was, December of 2013, before she's arrested, she made a statement to the Dorito police. That statement was turned over. At trial, she was cross-examined vigorously about that statement. And I would argue that that was not effective in the way that she had actually been prepared to say, I did lie when I went to the Dorito police. I lied at that time because I was covering for Mark Thompson. I'm no longer covering for Mark Thompson. I'm telling the truth now. He, in fact, wanted to have sex with my daughter, and she repeated that, I would say, 15 times in an incredibly damaging, to every question that was asked of her, that was her direct testimony. So not only, so she was cross-examined about that one statement, and I think she was successfully rehabilitated on that one statement because the prosecution was, in fact, able to argue, look how credible she is. She admitted that she lied. She admitted that she was covering for Mark Thompson. And here she is now. She's telling the truth. When, in fact, what had happened was over a year later, she still maintained that it was fantasy. Wait a minute. What's the year later? The year later is in the government's response to the motion for a new trial when the government says— But the discussion with Dr. Hasha occurred six months later. That's correct. So if it went back for a new trial, you'd be going on Dr. Hasha's statement. We'd be going on Dr. Hasha's statement, and there would be a request for the Brady information that apparently exists out there that the government had conversations with Rosalie Dornelis after she began cooperating where she confirmed her belief that it was fantasy and was not real. Those are the statements that the government raised. But, yes, the issue before this court is Dr. Hasha's statement. Aren't there two counts in this indictment? There are two counts. One is taking the photo, which they did. Which she did. She did at his behest. And second, grooming, you know, taking preparatory steps to have sex with her daughter. And could the jury look at—I mean, I know materiality is always an issue here, but could the jury look at what happened with the photo and extrapolate from that as part of the sufficient proof on the grooming charge? So this is how the evidence proceeded with respect to the taking of the photograph. There was text messages between Rosalie and Mark Thompson that discussed her daughter. Following that, there were text messages that said, from Mark Thompson to Rosalie Dornelis, I don't want a picture, forget the picture, you're confused. And what Rosalie Dornelis testified about was that in the phone conversations, what Mark Thompson was saying was, I need the photograph, I need the photograph. And that she took the photograph at his behest. But the materiality of her being impeached, both on the statement, which she believed it was all fantasy, and on her mental health information, which I believe would have given context to her confusion about what the actual intent was, I think that those things would have impeached her credibility as to the content of the telephone conversations. Rosalie Dornelis was such a critical witness for the government because she testified about there was documented text messages and then there were documented hours of phone conversations. And even the judge said, at one point, are we going to hear what the content of these phone conversations are? And we need to hear what the content is. And Rosalie Dornelis was the witness who testified as to what she and Mark Thompson were discussing, excuse me, on the phone. But that was consistent with the text messages. It wasn't consistent with, forget the photo, I don't want a photo. You're confused about why you love me if you think I want this photo. His testimony was that he never actually wanted the photo. This was all part of fantasy. So it was her testimony saying, no, in fact, he wasn't saying what he said on those text messages. He was telling me something different in person than what he was saying on the text messages. That was what was so critical to the government's case. And it goes to both counts with respect to she was the person who provided the evidence about what Mark Thompson's intent was because taken on their face, she also, they engaged in a lot of conversation that was very off-color, that these two people actually only met in person five times over this nearly year-long relationship. And so the primary bulk of it was these thousands and thousands of text messages and telephone calls. But without Rosalie Dornelis' testimony, and the prosecutor even said that in closing, if you believe Rosalie Dornelis, Mark Thompson is guilty. She was, in all effect, the government's case. I'm not saying to discount the text messages, but she was the person who interpreted the intent behind the text messages to the jury. I've gotten a little off track, but the other issue that really came to the fore, I think, that also goes to her credibility, and I think that these errors have to be looked at cumulatively, which is that she told the jury multiple times in a very emotional way that she faced 15 to 30 years if she was convicted, that she didn't understand the terms of her plea agreement, that she didn't think that she could get a downward departure. And this is someone whose guidelines actually put her very high up. Can you object to that? Object to? That testimony. They say that the plea agreement was in the record or available to defense counsel. It was. I think that the prosecution had an independent obligation. Well, that may be the case, but was there no objection? There was an objection to being curtailed by the district court. The district court was very involved in the questioning of witnesses, and there was an objection when defense counsel was questioning Ms. Jornalis and trying to pin her down both on when she had lied and when she had stopped calling this a fantasy and to her statements about her sentence of 15 to 30 years. And the district court stepped in and said, this is all clear, I'm cutting you off, to which defense counsel objected. All right. But it is correct, the plea agreement and all that was in the record. The text of the plea agreement was in the record that refers to a 5K, 1.1 motion. All right. I'm going to reserve. Yeah, you've reserved your rebuttal time. Thank you. All right. Mr. Pierce, were you trial counsel? I was not, no. Mr. Chief Judge, and may it please the Court, James Pierce for the United States. The information in the Hasher Report was not material, but cumulative, not impeaching, and outweighed by evidence directly from the defendant. Rosalie Jornalis was extensively cross-examined,  had a reasonable probability of affecting the outcome. Because Mr. Thompson's other claims also have merit, this Court should affirm. Now, starting with the Hasher Report, this Court has repeatedly made clear that when evidence or information that a defendant doesn't have at trial would be cumulative and would impeach a witness who has already been impeached, then that is not material evidence. And here the defendant has made clear in his opening brief, and the Court has discussed, that Jornalis was extensively impeached at trial. Additionally, getting to a point that Judge Clement raised, you also look at the materiality analysis in light of the other evidence that was presented during the course of the trial. In closing argument, the government's primary argument was look at the text messages. The text messages speak for themselves, and they are the ones, the text messages, the Skype and Viber messages, they tell you what the defendant's intent was here. Now, the passages that were quoted today, the government made those arguments in rebuttal closing after the defense gets up and attacks Jornalis in its own closing argument. But the point remains the same, bless you, that the primary thrust of the government's evidence was those text messages. Now, an additional reason why... Why put Jornalis on the stand? Jornalis is... Rather than prove him up. She is important for context. We wouldn't disagree with that. I'm not sure we would call her the key witness. I think the key, well, perhaps a key witness... She's the only witness, right? She's certainly not the only witness at trial. What other witnesses were there for the prosecution? So there was a special agent that was used to present the text messages. There were some of the police officers that spoke about the investigation. There was the daughter of Ms. Jornalis who spoke about her direct conversation. Yes, but the only person who could really say this... You can introduce the text messages, and you could have made the case without Jornalis, but you made the case with Jornalis. This is true. But where this court has found a Brady violation on materiality, for example, cases like Tassin v. Cain cited in the briefs and the Lacaze case cited in the defendant's opening brief, the problem was the witness for whom there was the violation was the only source of information on the relevant aspect of proof, here the intent of Mr. Thompson. Again, the text messages here are strong, and in fact we believe stronger evidence of what Mr. Thompson's intent was. Now I also want to clarify a couple of, I think, factual problems here with Mr. Thompson's argument. One is, and we make this point in our brief, when Ms. Jornalis meets with Dr. Hasha six months after the initial statement, she still hasn't begun cooperating with the government. And so her statement, which is far less definitive than her, it was clearly fantasy, he never intended to do this. Her statement, I think it was perhaps fantasy, I don't think he would have gone through with it, was itself entirely consistent with her continuing to cover for Thompson. So there's not some sort of inconsistency there. But she had been indicted, right? She had. She had certainly been arrested. I think the indictment had come down at that point. That's correct. She had been arrested and her defense counsel knew that there was a problem, right? Certainly. That's, I think, part of it. That's why they retained this woman. But it still seems to me, what about this other evidence that they say you may have, where she may have continued to say that part of it was fantasy? Fantasy. So that's an argument that is made in passing in the reply brief. I'm not clear with where that is in the record. Again, I was not trial counsel. But as far as the record shows, and Chief Judge Stewart made reference to this, the testimony at trial was I covered for her, excuse me, Dornelas covered for Thompson and she says I was lying there. She never says again that I lied going forward. And the only time that we hear about her saying, actually, you know what, I think if he had the chance he would have had sex with my daughter, that came out at trial itself. There's no indication that the government ever discussed what Dornelas' view on Thompson's intent was. And there's a good reason for that as well, which is if the court has reviewed Dornelas' testimony, this would come through clearly. The government said during rebuttal, Ms. Dornelas was originally from the Philippines, not a native English speaker, had a number of communication problems, and frankly the government's meetings with Ms. Dornelas were simply to understand what had happened and to place those text messages in context. Now, the citations to the record about Ms. Dornelas' repeated statements, it was not 15, it was about six or so, that I think Thompson would have in fact had sex with my daughter, those were not statements that were elicited in direct examination. All of the statements are from the cross-examination. Now, if it was so important for the government to get Dornelas' view on what Thompson's intent was, one would think that that would be the kind of thing that the government would have elicited and then argued in closing. Now, the government didn't argue it in closing, and again, all of the citations in the defendant's brief are to the cross-examination testimony. I reviewed the direct, I don't believe the government ever elicited it, which would be consistent with the government not seeing this as a particularly important piece of evidence. Dornelas is there to provide context for the communications, but she's not there to opine on what the defendant's intent was. That is provided by the defendant's own statements directly through the text messages, and then statements that the defendant made to Dornelas, which Dornelas is listing, but is not providing any kind of analysis on. Let me turn to the NAPU issue, specifically the plea agreement. I'm happy to address any other questions on this, but certainly my friend on the other side raised this briefly towards the end of her argument. The plea agreement was in the record. Ms. Dornelas, when she was asked about this on cross-examination, seemed genuinely confused about what her plea agreement entailed. The judge said, is the government willing to get up and stipulate that it has made a motion and would seek a sentence below 15 years? The government said, yes, we'll get up and stipulate to that so that there is no confusion about what Ms. Dornelas is facing. Mr. Thompson's counsel objected to that and said, I won't stipulate to the government making that statement on the record. I don't know why, but that's what happened. And then in closing argument, Mr. Thompson's counsel extensively said, don't believe Ms. Dornelas' testimony. She's got to be lying that she doesn't understand this 15 years, that she can receive a sentence below the 15-year maximum. The concern in NAPU is that the government is either actively eliciting false testimony or is allowing false testimony to kind of go through, to come out without correcting it, so that the jury is sort of unaware that, in fact, a witness has some incentive that is not disclosed. Here, that was fully disclosed. The government took efforts to, I mean, perhaps we could have done a better job on redirect making that point more clearly, but the point was fairly clearly made that Ms. Dornelas could receive a sentence below 15 years, and it was a point argued extensively in the closing arguments. Did the plea agreement reference the 5K letter? It did, yes, it made reference. I actually think it may have been a 3553E letter, which is what allows the government to go below the statutory maximum, I'm sorry, mandatory minimum. But the point is the assistance, the government allowing, providing a way to get a lower sentence below the statutory mandatory minimum. I'm happy to... Well, let me make another point. I think, Judge Jones, you raised the question about whether the evidence in support of count one could be used to also support the defendant's intent on count two. I think the answer to that is yes, but I also think there's another important point  which is that on the Brady materiality question, all of this question about whether or not the defendant would have wanted to have sex with Ms. Dornelas, that's relevant for count two. That's what charges his interest or his attempt to induce Ms. Dornelas's daughter to engage in unlawful sexual activity. Count one charged the making of child porn, essentially, the teaming up of Ms. Dornelas and the defendant to make video and, in fact, exchange pictures. That happened. We charge an attempt, but that... There's really no dispute about that. There's certainly an evidentiary argument, but we think the evidence is quite strong. The exchange of pictures is in the record. So even if this Court has some discomfort on the materiality question with respect to, you know, whether the information should have been turned over and what the intent of Thompson's was vis-à-vis having sex with Ms. Dornelas's daughter, that doesn't address count one. The sentence was 360 months concurrent on each count. So ultimately, again, and I'm not saying this to concede our arguments on count two, but that on count one, the conviction and the sentence are fully disposed of this case. Let me ask you a question. In the case that we just heard, and I think you were in the courtroom... I was. ...these people took two underage minors on about a three-month spree each, prostituting them multiple times, five or six, seven days a week. And the leader of that team got a 25-year sentence. Now, what this creepy man did gets him a 30-year sentence. That's true. What's going on here? Well, you know, that may speak... I mean, bad is what happened, you know, shocking, as all this might have been to Ms. Dornelas's daughter, who is now apparently reconciled with her mom, according to something I read. Isn't it... I mean, I just... I'm not sympathetic with these kinds of situations, but I do wonder why they have more severe sentences than the actual, you know, guys who run the prostitution ring. I think that's a fair question. Of course, Mr. Thompson hasn't raised the challenge to a sentence here, but I understand that's not... you're asking sort of a larger policy question. Some of that may well have to do with the way Congress has set out the sentencing schemes. A lot of that is probably a function of the guidelines themselves and how they peg different offenses. I think the sentence that Mr. Thompson received was certainly a very stringent one, but I don't think it's unfair, and perhaps the fact that there's been no challenge to it suggests Mr. Thompson doesn't feel too strongly about that either. I grant that when you look at other offenses, there are times when it seems odd, but the sentencing guidelines... What was the sentence in the Broussard case? I believe the sentence in the Broussard case was a series of consecutive 240-month sentences that maybe got up to 400... Sorry, 480 months, whatever that would be, 40 years. I don't... I think I was on... I don't remember. So I know that one of the problems was it was this kind of consecutive sentences. I believe the ultimate sentence was 480 years, and, of course, this Court overturned that in the face of an objection from the defense there. Mr. Thompson hasn't sought this, and I don't think it would be the Court's place sua sponte to do it, but there are... With the discretion that is accorded to sentencing judges, I think that this falls in as a procedurally and substantively reasonable sentence, which, again, hasn't been otherwise challenged. I know there are other issues about the proposed expert testimony and some of these others. I'm happy to answer any of the questions related to those. I am equally happy to give back the rest of my time to the Court. Any questions? All right, thank you, sir. Thank you. All right, back to you, Ms. O'Connor. Thank you, Your Honors. Briefly, in response to the government, you know, with respect to whether or not the statement that Rosalie Dornelis gave to Dr. Hasha was cumulative and was less definitive than her statement to the Derrida police, I just want to emphasize that at trial, Ms. Dornelis was extensively questioned about the fact that she lied to the Derrida police, or that's what she said, that she lied to the Derrida police, and she was effectively able to overcome having said that she lied. She was effectively able to overcome that by saying, yeah, I lied then, this is the reason, I was still under the influence of Mark Thompson, but now things have changed, and now I've realized the influence he had over me. Did they ever engage in sexual activities in or around Ms. Dornelis' house? It was all at hotels, near casinos. I don't believe there was anything near her house. And the point of, you know, I think what the law says is when the credibility of a witness is under siege, the issue is whether the withheld statement casts it in a wholly different light, and I would submit to the court that this new statement to Dr. Hasha in a wholly different context, after she'd been indicted, after Mark Thompson had been indicted, after neither of them were speaking to each other, does cast what her testimony was in an entirely different light. With respect to the stipulation on your, do you have a question about that? I was just curious, did her husband testify? No. There was an issue about the trial court asking the government if they would stipulate that Ms. Dornelis was subject to a sentence reduction for her substantial assistance. That occurred in the midst of defense counsel attempting to question Rosalie Dornelis about her understanding of her plea agreement. This is a woman who, at this point, had counsel for over a year, had entered a plea of guilty, and had presumably been boycottized, who had waived her rights to give a statement at the Derrida Police Department, had gone through all sorts of legal interactions and waiving rights and agreeing to certain things. It was implausible that she did not understand the terms of her plea agreement, particularly when her plea agreement was a significant departure. She received five years. She did not have a protective order. In spite of the fact that she's the one that took the video of her child, there was no protective order against her children. Her children were able to visit her, and she's not subject to the mandatory period of supervised release. She got a very sweet deal in exchange for her testimony, and the offer to stipulate came in the midst of defense counsel attempting to question her and confront her about her understanding. And that's why he refused to offer the stipulation, because right after the trial court said, well, government, won't you stipulate that she can have a sentence reduction, trial counsel said, no, I'm trying to question her, and the trial court at that point cut him off from questioning her further. And my impression was that the jury was left with the impression that this crying woman was subject to 15 to 30 years and that that was her... that was the sentence that she was going to receive was 15 to 30 years. Well, in a case where the evidence might have been sparse, maybe that has more traction, but, you know, you're not arguing that the 30 years he got was too much, but on the other hand, you want to say because of the plea agreement, you know, her time was critical here. I mean, I'm having trouble with... I mean, I get your point, but, you know, how much probative worth that has in the scheme of he got 30 years, he had no prior record, et cetera, et cetera. It is what it is, but there's no argument that what he got is too much, but yet you're sort of pounding on the plea agreement and whether she understood it. I would submit to the court that the issue was not raised in terms of an excessive sentencing, but in terms of the bias of the court, and I did point out, I'm sorry if this offends, but I did point out that during sentencing that the trial judge compared this case where... Assuming arguendo, what the trial judge did was not a best case practice, quote, unquote, you know, how does it get to be reversible error? I mean, in a better case, you know, I'd probably acknowledge she shouldn't have said it, but that said, in the scheme of all of this, how do you get reversible error, though, out of the, you know, out of the sentence? I mean, that's the cut line. I mean, assuming, you know, she shouldn't have done it, shouldn't have said it, judges sometimes say things they ought not to say. He's entitled to a fair trial, not a perfect trial. So, you know, what's the best case you've got? You know, what happened here, you know, is reversible error on the sentence. I agree. It's a very... And for good reason, it's a very high standard to establish that bias actually affected the outcome of the trial. In the bias section, I did raise the severity of Mark Thompson's sentence as the prejudice that was caused by the bias. Well, it's clear here the trial judge was discomforted, shall we say, with the nature of this case, the testimony, the whole nine yards, you know, at points, the recesses, and on and on and on. So, you know, the guy gets convicted, you know, he gets 30 years. So I'm saying, I mean, it's kind of past the bias, but the judge has sort of an eye to this crime. I mean, when I was a state judge, there were people, if it was a theft, somebody might get, you know, forever, whereas if it was a crime of violence, maybe they got less. My point is that you're going to get the variation in the outlook, and it's clear here the judge was very, you know, not wanting to hear this testimony. So the 30 years may be more a circumstance of that than anything else. Well, I agree, Your Honor, and I think that just as, you know, when we tell jurors that you may be an honest, upstanding, fair-minded person, this just may not be the case for you. I think that this judge, had she been questioned as a juror, would have been subject to a four-cause challenge based on not being able to tolerate the subject matter. Well, you know, it is what it is. I guess I would just say, I decidedly, if you were making the point, as poignantly as you are, about the judge's bias, it might have had more traction if it was tied to the severity of the sentence. I put that in as a prejudice. I did put that in as a prejudice, as evidence of the prejudice that was caused by the bias. So if bias, if there's bias, but there's no prejudice to the defendant through the bias, then the bias is really harmless error, sort of. But the prejudice, part of it was the rulings, I believe. Part of it was not disclosing the HACHA report, and part of it was the severity of the sentence. I know I'm way out of time. Well, you don't get to do more argument. You get to answer my questions instead of ours. But I'm done on that one. On that, I mean, you're basically done. But let me ask you this. Okay, your court appointed here, is that right? You were retained counsel along with somebody else at the trial? I was pro bono-ish. Oh, you were pro bono? Okay, there was another counsel, the main counsel, right? Yes. That person was pro bono, too? He was retained. Oh, he was retained, you were pro bono, and then you get to come argue the appeal, court appointed. Ha! Okay. All right, I shall say no more. Except to say we do appreciate the service of court appointed counsel in all our cases, and this would be no, it's a difficult case to put it mildly on the facts and so forth. So we do appreciate the briefing and argument in the case, and otherwise the case would be submitted. Thanks for your briefing and argument. Counsel, we'll review the entire record and rule on it in due course. Can I make just one brief point in response to it? One sentence, no commas, no semicolons. I just did want to point out that the video does not speak for itself in the sense that the agent described the video as not in itself illegal. The video that was taken, that's the second sentence, the video that was taken was not photographic. All right, we'll look at the whole case. We'll look at the whole case, I promise you. Thank you very much. All right, thank you, counsel, in those cases. As stated before we call it a day,